**FILED & ENTERED**

**JUN 08 2018**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>Process America, Inc.<br><br><br><br>Debtor(s). | CHAPTER 11<br><br>Case No.:  1:12-bk-19998-MT<br>Adv No:   1:14-ap-01154-MT |
| Process America, Inc., a Nevada corporation<br><br>Plaintiff(s),<br><br>    v.<br><br>Cynergy Holdings, LLC<br><br><br>Defendant(s). | **MEMORANDUM OF DECISION RE (1) CYNERGY'S AMENDED MOTION TO CONFIRM RECOUPMENT RIGHTS; (2) CYNERGY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; AND (3) DEBTOR'S MOTION FOR IMMEDIATE TURNOVER OF PROPERTY OF THE ESTATE**<br><br><br>Date:        July 11, 2017<br>Time:       10:00 a.m.<br>Courtroom:  302 |

//

//

//

This memorandum addresses three separate motions pending in this bankruptcy case and related adversary proceeding:

> (1) Motion to Dismiss Process America's ("Debtor") First Amended Complaint, filed by Cynergy Holdings, LLC's ("Cynergy") (the "MTD," ad. ECF No. 86);
>
> (2) Debtor's Motion for Immediate Turnover of Property of the Estate (the "Turnover Motion, " ad. ECF No. 77); and
>
> (3) Cynergy's Amended Motion to Confirm Recoupment Rights or for Relief from the Automatic Stay to Effect Setoff (the "Recoupment Motion," bankr. ECF doc. 465).

As all arise from a common nucleus of facts, they will be discussed together.

## BACKGROUND

The procedural history is extensive but highly relevant to the issues presented in these three motions, so it will be summarized first in some detail.  On or about May 19, 2004, Process America ("Debtor") and Cynergy's predecessor entered into a contract related to credit and debit card processing (the "ISO Agreement").  In September 2009, Cynergy's predecessor filed a voluntary chapter 11 petition in the U.S. Bankruptcy Court for the District of Delaware (the "Cynergy Bankruptcy").  During the Cynergy Bankruptcy, Cynergy's predecessor moved to assume and assign the ISO Agreement (the "Assumption Motion"), within which it also sought to set forth a cure amount as to the ISO Agreement.  In June 2010, in connection with the Assumption Motion and the related sale of certain assets by Cynergy's predecessor to Cynergy, the parties entered into a Cure Resolution Notice and Stipulation in Satisfaction of the Objection by Process America to the Debtors' Cure Notice (the "Cure Stipulation").

Cynergy and Process America then continued to do business together under this ISO Agreement.  In February 2011, Cynergy sent a letter to Debtor informing it that Cynergy was terminating the ISO Agreement "immediately" based upon its belief that Debtor breached the ISO Agreement (the "Termination Letter").  The Termination Letter also informed Debtor of Cynergy's intent to not renew the ISO Agreement.  Thereafter, Cynergy ceased residual payments to Debtor.

On February 16, 2012, Debtor initiated a lawsuit against Cynergy (the "New York Litigation") in the United States District Court for the Eastern District of New York (the "District Court"). On May 30, 2012, Debtor amended its complaint and asserted nine causes of action against Cynergy which included: (1) Trademark Infringement and False Designation of Origin – Lanham Act; (2) Unfair Competition – Lanham Act; (3) Unfair Competition; (4) Breach of Contract; (5) Unjust Enrichment; (6) Quantum Meruit; (7) Tortious Interference of Contract with Merchants; and (9) Indemnification.

In response to Debtor's Complaint, on June 11, 2012, Cynergy filed its amended answer and asserted six counterclaims against Debtor, which included (1) Breach of Contract; (2) Tortious Interference with Contract; (3) Deceptive Practice and Common Law/ Unfair Competition; (4) Defamation; (5) Permanent Injunction; and (6) Indemnification.

The causes of action involve three distinct sources of funds.  The first category is the residuals (the "Residuals"), which is the compensation earned by Debtor under the ISO Agreement, less the data fees provided for under Exhibit A of the ISO Agreement. The Court refers to the Residuals earned through December 31, 2012, as the "First

Period Residuals" and the Residuals earned from January 1, 2013 forward as the "Second Period Residuals."[1]

The second category is known as the EP/ISO Reserves (the "EP/ISO Reserves"). These funds derive from a portion of the Residuals that Cynergy is permitted to retain. The amount of funds retained by Cynergy in the EP/ISO Reserves is determined by a formula provided for in § 3.11(C)(i) of the ISO Agreement.

The third category is the amount held by Cynergy under the "Cure Stipulation." The Cure Stipulation resolved an issue during Cynergy's predecessor's bankruptcy case between Debtor and Cynergy's predecessor about the proper amount of the cure payment to which Debtor would be entitled upon Cynergy's predecessor's assumption of the ISO Agreement under 11 U.S.C. § 365.[2] The claims and rulings are easier to understand, especially as they relate to the remaining issues to be decided here, if one keeps the different categories of funds in mind.

The parties subsequently filed cross-motions for summary judgment on all causes of action in the District Court. On September 23, 2013, the District Court entered its Decision and Order granting in part and denying in part Cynergy's summary judgment motion and denying Debtor's summary judgment motion, with the balance of the issues proceeding to trial (the "DC MSJ Ruling"). The District Court found that Cynergy retained ownership over the merchant portfolio under the terms of the ISO Agreement. The District Court also ruled that if Debtor breached the ISO Agreement by holding merchant reserve funds in its own account, said breach would be material. There were questions of fact as to whether Debtor's actions constituted a breach.

---

[1] Beginning and end dates for the First and Second Residual Periods were determined using the damages cut-off date applied by the District Court on remand. See Turnover Motion, Ex. I, internal pg. 4.
[2] See Motion for Immediate Turnover of Property of the Estate, Ex. B.

Meanwhile, on November 12, 2012, Debtor commenced its bankruptcy case by filing a voluntary chapter 11 petition (the "Petition Date") in the Central District of California. Debtor continues to manage its financial affairs and bankruptcy estate as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

Tigrent Group Inc. ("Tigrent") is one of Debtor's largest creditors, with a scheduled claim of $8.3 million, comprising approximately 80% of the total amount of $10.1 million scheduled general unsecured claims in the Bankruptcy Case (which excludes Cynergy's recent judgment claim from the New York Litigation). Tigrent has filed suit against Cynergy in New York, alleging certain bad acts of Cynergy related to merchant credit and debit processing. On January 4, 2013, Debtor and Cynergy filed a stipulation for relief from the automatic stay to allow the New York Litigation to continue solely to liquidate the claim.[3] Since the petition date, the creditors of the estate have been waiting for Debtor to complete the Cynergy litigation in an attempt to monetize claims for some recovery to Debtor's many creditors.

In April 2014, the District Court ruled on cross-motions for reconsideration of its earlier ruling and summary judgment as to the remaining causes of action (the "Reconsideration Ruling"). The District Court denied Debtor's Motion for Reconsideration of the determination of the ownership of the merchant portfolio, but then granted summary judgment to Debtor as to its claim that Cynergy breached the ISO Agreement by improperly withholding residuals because Cynergy did not comply with the terms of the ISO Agreement that would have given it the right to keep the

---

[3] See Stipulation Between Debtor and Cynergy Holdings, LLC for Relief from the Automatic Stay for the Purpose of Liquidating Claims in Pending Litigation (the "RFS Stipulation"), bankr. ECF No. 62; Order Approving RFS Stipulation, bankr. ECF No. 69.

residuals.  The District Court then granted Cynergy summary judgment as to all other claims brought by Debtor.  Lastly, the District Court ruled that Debtor had defamed Cynergy.  All issues of damages and rights of indemnification were reserved for trial.

On September 4, 2014, Debtor commenced this adversary proceeding, <u>Process America, Inc. v. Cynergy Holdings</u>, LLC (1:14-ap-01154-MT) (the "Adversary Proceeding") against Cynergy, alleging claims of: (1) Declaratory Relief; and (2) Turnover of Property of the Estate. The Declaratory Relief claim seeks a judicial determination as to the rights and interests of the parties in and the EP/ISO Reserve, asserted to be approximately $1,800,000, and for the court to find that the EP/ISO Reserve Account and additional deposits are property of Debtor's estate. Because Debtor alleged that the EP/ISO Reserve Account and additional deposits are estate property, it also sought turnover of these funds under 11 U.S.C. § 542. Pursuant to Section 3.11(C)(iii) of the ISO Agreement, the amount of the EP/ISO Reserve Account is required to be the "greater of either: a) $10,000, or b) 1% of the Merchants' dollar volume of transactions during the month previous to the month of termination," which is approximately $128,000. Thus, Debtor argues that the amount in the EP/ISO Reserve Account is excessive, and not in accord with the terms of the ISO Agreement.

On May 30, 2015, the District Court entered its Findings of Fact and Conclusions of Law (the "Trial Findings") after trial and held that Debtor was liable to Cynergy in the amount of $8,822,000.  The District Court determined that Cynergy had breached the ISO Agreement by improperly withholding Residuals owing to Debtor and also by failing to give proper notice and opportunity to Debtor to cure an alleged material breach.[4]  The District Court held that the first clause of the ISO Agreement limited Debtor's award to

---

[4] <u>Turnover Motion</u>, Ex. C.

actual damages, and, thus, consequential damages would not be allowed.[5]  Because

Debtor's damage for Cynergy's breach of the ISO Agreement was subject to the

damages cap, the District Court offset Cynergy's $8,822,000 damage award by the

$300,818 due to Debtor, resulting in a net judgment to Cynergy of $8,521,182.  Both

parties filed appeals before the Second Circuit Court of Appeals.

On October 16, 2014, Cynergy filed a Motion to Dismiss Complaint or, Alternatively,

to Stay Adversary Proceeding (the "MTD") in the bankruptcy court, which was thereafter

continued from time to time to allow the parties to complete the New York Litigation.  On

August 19, 2015, Cynergy also filed a Motion to Confirm Recoupment Rights or for

Relief from the Automatic Stay to Effect Setoff (the "Recoupment/ RFS Motion").  Both

were opposed by Debtor.

On September 9, 2015, this Court held hearings on the above-referenced motions,

as well as status conferences on both the chapter 11 bankruptcy case and related

adversary proceedings.  After considering the pleadings filed and the oral arguments

made at the hearings, the Court granted in part Cynergy's Recoupment/ RFS Motion

and permitted it to recoup $128,000 against the Reserve Fund.  The hearings on the

MTD and on the issues that remained to be resolved in the Recoupment/RFS Motion,

as well as the attendant bankruptcy and adversary status conferences, were then

continued to February 24, 2016.  Thereafter, these matters were continued several

times by stipulation, to allow the parties time to complete the appeals.

On or about October 5, 2016, the Second Circuit affirmed in part, vacated in part,

and remanded for the District Court to recalculate the damage award, in light of its

---

[5] Id. at Ex. C, p. 70; Ex. A, p. 27 (¶ 4.6 "Damages").

ruling.[6]  On or about February 22, 2017, the District Court issued its ruling on the

recalculation of damages (the "Remand Judgment").[7]  In the Remand Judgment, the

District Court explained that Cynergy's total damages are $4,863,000 for the decline in

the portfolio value, which amount must be offset by $300,818 for Debtor's damages and

$3,939,966 to account for the amount Cynergy saved by not making the payments to

Debtor due for the First Residual Period.[8]  Thus, the District Court found that Cynergy is

entitled to $622,216 in damages.[9]

Thereafter, in March and April 2017, the parties engaged in back and forth briefs

with the District Court about how each believed the Remand Judgment should be

amended (the "Rule 59 Motions").  Debtor argued that the Second Circuit's finding that

the amount of damages to which Cynergy is entitled must be offset by any amount

Cynergy saved as a result of the breach requires that the offset be calculated from

February 1, 2011 through the present, and not cut off at December 31, 2012.  Debtor's

position was that because Cynergy continues to withhold residuals, limiting the period

for calculation of its offset to the First Residuals Period is not proper.   Cynergy, for its

part, moved to amend the Remand Judgment to include pre-judgment and post-

judgment interest at the applicable statutory rates under 25 U.S.C. § 1961 and

applicable New York law.

On April 20, 2017, the District Court ruled on the Rule 59 Motions, finding that

Cynergy was entitled to pre-and post-judgment interest under New York law (the "Rule

59 Order").  As to Debtor's contention that Cynergy's damage award should be further

---

[6] Process America v. Cynergy Holdings, LLC, 839 F.3d 125 (2nd Cir. 2016) (the "Circuit Court Ruling").
[7] Notice of Debtor's Intent to Proceed with Hearing on Cynergy's Motion to Confirm Recoupment Rights or for Relief from the Automatic Stay to Effect Setoff (the "Notice of Intent"), bankr. ECF No. 449.
[8] Id.
[9] Id.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

offset by the residuals it held from January 1, 2013 until the present, the District Court

held that a such a request under Rule 59 was procedurally improper because "[u]ntil it

filed this motion, Process America never claimed that Cynergy's damages should be

reduced by residual payments starting from January 1, 2013."[10]    The District Court

went on to explain that a Rule 59 motion was an improper procedural vehicle to present

new evidence and denied Debtor's request to further reduce Cynergy's damage

award.[11]

## MOTION TO DISMISS AMENDED COMPLAINT

The central motion here is a motion to dismiss Process America's First Amended

Complaint (the "FAC").  The Turnover and Recoupment motions will be discussed as

part of that discussion.  A motion to dismiss under Rule 12(b)(6) challenges the

sufficiency of the allegations set forth in the complaint.  "A Rule 12(b)(6) dismissal may

be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts

alleged under a cognizable legal theory.'"[12]

In resolving a Rule 12(b)(6) motion to dismiss, the court must construe the

complaint in the light most favorable to the plaintiff and accept all well-pleaded factual

allegations as true.[13]  On the other hand, the court is not bound by conclusory

statements, statements of law, and unwarranted inferences cast as factual allegations.[14]

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

---

[10] RJN in support of Turnover Motion, Ex. I, p. 4.
[11] Id.
[12] Johnson v. Riverside Healthcare Sys., 534 F.3d 1116, 1121 (9th Cir. 2008), quoting Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).
[13] Id.  at 1122; Knox v. Davis, 260 F.3d 1009, 1012 (9th Cir. 2001).
[14] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007).

'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[15]  "If there are two alternative explanations, one advanced by the defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."[16]

When ruling on a Rule 12(b)(6) motion to dismiss, if a court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond.[17] A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.[18]  Certain written instruments attached to pleadings may be considered part of the pleading.[19] Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.[20]  Many documents were attached to the FAC or incorporated by reference and are considered here.

### Summary Judgment in this Procedural Context

Debtor argues that this case has been pending for years, and that the parties have had more than sufficient time to respond to the arguments made in favor of

---

[15] Id. at 555 (citations omitted).

[16] Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011); see also Moss v. United States Secret Serv., 2013 U.S. App. LEXIS 4121 (9th Cir. Feb. 26, 2013).

[17] See Fed.R.Civ.P. 12(b); U.S. v. Ritchie, 342 F.3d 903, 907-908 (9th Cir. 2003)(internal citations omitted).

[18] See Van Buskirk v. CNN, 284 F.3d 977, 980 (9th Cir.2002); Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994); 2 James Wm. Moore et al., Moore's Federal Practice § 12.34[2] (3d ed.1999).

[19] Fed.R.Civ.P. 10(c).

[20] See Van Buskirk v. CNN, 284 F.3d at 980 (9th Cir. 2002).

summary judgment as to the Reserve Account.  Although a "court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion,"[21] the Court can consider materials outside the complaint as long as the motion is treated as one for summary judgment.

There are, however, two exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion. First, a court may consider "material which is properly submitted as part of the complaint" on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment.[22] If the documents are not physically attached to the complaint, they may be considered if the documents' "authenticity ... is not contested" and "the plaintiff's complaint necessarily relies" on them.[23] Second, under Fed. R. Evid. 201, a court may take judicial notice of "matters of public record."[24]

At this stage, the Court has the discretion to grant summary judgment on at least some issues on this record, but will refrain exercising that discretion.  Because of the briefing schedule, the parties did not have the same amount of time and opportunity to detail the undisputed facts as Fed. R. Civ. P. 56 would have allowed.  While the legal conclusions in this memorandum will control this action, there are potentially factual issues to be determined after discovery that determine the final ruling.

---

[21] Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), *overruled on other grounds by* Galbraith v. Cnty. Of Santa Clara, 307 F.3d 1119, 1125–26 (9th Cir. 2002)

[22] Lee, 250 F.3d at 688.

[23] Parrino, 146 F.3d at 705–06 (9th Cir.1998).

[24] Lee, 250 F.3d at 689, citing Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir.1986).

## CLAIM AND ISSUE PRECLUSION

The preclusive effect of a former adjudication is often referred to as *res judicata*. The doctrine of res judicata includes two distinct types of preclusion, claim preclusion and issue preclusion.[25]  Claim preclusion "treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'"[26]  Claim preclusion "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."[27]

The doctrine of issue preclusion, on the other hand, prevents relitigation of all "issues of fact or law that were actually litigated and necessarily decided" in a prior proceeding.[28]   The issue must have been "actually decided" after a "full and fair opportunity" for litigation.[29]  Issue preclusion bars relitigation of issues adjudicated in an earlier proceeding if three requirements are met: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding.[30]

As a general matter, Cynergy seeks to expand the earlier Second Circuit and District Court rulings beyond what they actually held and Debtor seeks to have the

---

[25] Robi v. Five Platters, Inc., 383 F.2d 318, 321-22 (9th Cir. 1988).

[26] Id., (quoting Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc., 575 F.2d 530, 535 (5th Cir. 1978)); see also McClain v. Apodaca, 793 F.2d 1031, 1033 (9th Cir. 1986).

[27] Brown v. Felsen, 442 U.S. 127, 131 (1979), quoted in Americana Fabrics, Inc. v. L & L Textiles, Inc., 754 F.2d 1524, 1529 (9th Cir. 1985).

[28] Robi v. Five Platters, Inc., 383 F.2d at 322 (quoting Segal v. American Tel. & Tel. Co., 606 F.2d 842, 845 (9th Cir.1979)).

[29] 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4416 (3rd ed.).

[30] Revn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 (9th Cir.2006).

Court ignore some earlier rulings. Cynergy cites to a number of cases arguing that

Debtor is precluded from relitigating most of the issues in its FAC.  The majority of these

cases, however, do not address preclusion in a bankruptcy context or are not controlling

Ninth Circuit authority.  For example, this is not a situation where an earlier injunction

could affect later damages actions.[31]  Similarly, cases cited by Cynergy where the

scope of an earlier judgment is extended to a non-party defendant deal with separate

issues.[32]

In Cogliano v. Anderson, a case relied on by Cynergy, the issue was whether an

order denying the debtor's first amended claim of exemption was preclusive to the issue

of whether the property (an IRA) was an asset of the estate.[33]  The court analyzed

whether it was proper for the bankruptcy court to give preclusive effect to *its own order

in the same case,* which did not involve different considerations when moving between

bankruptcy and non-bankruptcy courts.   In fact, when determining whether the debtor

should be precluded, the BAP examined exceptions to claim preclusion which apply

here, as explained in the Restatement of Judgments:

> When any of the following circumstances exists, the general rule
> [against claim splitting] does not apply to extinguish the claim, and
> part or all of the claim subsists as a possible basis for a second
> action by the plaintiff against the defendant:
>
> [...]

---

[31] See Anderson v. Seaworld Parks & Entertainment, Inc., 132 F. Supp. 3d 1156, 1165 (N.D. Cal. 2015)(district court considered whether preclusion would apply to prevent the filing of individual damages claims if an injunction-only suit were permitted to continue in state court).

[32] See *e.g.,* Connell v. Liberty Mutual Ins. Co. 841 F. Supp. 578 (D. Del. 1994)(aff'd 37 F.3d 1486 (3rd Cir. 1994)(holding that when a plaintiff proceeds to trial and obtains a conclusive determination with respect to damages, a future defendant, such as an underinsured motorist insurer, has the option of offensively asserting the doctrine of collateral estoppel to prevent a plaintiff litigating the issue again).  The same is true for Byars v. State Farm Mut. Auto Ins. Co. 2015 WL 158789 (E.D. Penn, Jan. 12, 2015), another case in which a plaintiff who had obtained a damage award sought to augment those damages in a second suit, based on an uninsured motorist policy.

[33] Cogliano v. Anderson, 355 B.R. 792, 800 (B.A.P. 9th Cir. 2006).

(c) The plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief; or....

Cogliano v. Anderson, 355 B.R. 792 at 804, quoting Restatement (Second) of Judgments § 26 (1982).

In a case more on point, the bankruptcy court considered the preclusive effect of a judgment, after the bankruptcy court abstained in the matter to allow it to proceed in state court.  In In re Comstock Fin. Serv., Inc., creditors of a converted chapter 7 debtor obtained an abstention order permitting them to pursue claims against the debtor and others in state court.[34]  Default judgments were obtained by the creditors in state courts that included general damages, prejudgment interest, RICO treble damages, attorney fees, costs, postjudgment interest, and imposition of constructive trust upon all debtor's assets.[35]  The chapter 7 trustee moved to disallow portions of creditors' claims. The Comstock court held, among other things, that a bankruptcy court resolving disputes over allowance, disallowance, or subordination of claims can never be bound by prior judgment of another court, except to the extent that the judgment is an initial determination of the nature of the claim and the amount of resulting damages under nonbankruptcy law.[36]  The court in Comstock explained,

Apart from the limited grant of the Abstention Order, it is practically impossible for courts other than the bankruptcy court, which has exclusive *in rem* jurisdiction over property of the estate, to rule upon allowability, the purpose of which is to insure equitable distribution

---

[34] In re Comstock Fin. Serv., Inc.,  111 B.R. 849, 852 (Bankr. C.D. Cal., 1990).
[35] Id.
[36] Id. at 858.

of property of the bankruptcy estate to all of the estate's creditors. […] Thus I conclude that a bankruptcy court or district court resolving disputes over the allowance, disallowance or subordination of claims can never be bound by the prior judgment of another court except to the extent it is an initial determination of the nature of the claim and the amount of the resulting damages under non-bankruptcy law. Any decision regarding the satisfaction or treatment of such liquidated claims under bankruptcy law are within the exclusive *in rem* jurisdiction of federal courts presiding over the subject bankruptcy case.

In re Comstock Fin. Serv., Inc., 111 B.R. 849 at 859.

Process America and Cynergy have litigated the specific claims made in the District Court pleadings.  The claims that were actually and necessarily decided for resolution of those particular issues between those two parties will be given proper preclusive effect here.  Preclusion will not, however, affect those issues that were reserved for resolution by the bankruptcy court.  As in Comstock, the parties here stipulated to relief from the automatic stay to continue litigation between Cynergy and Debtor before the District Court.[37]  By stipulating to relief from stay to allow the District Court to liquidate the claim, Cynergy consented to the splitting of Debtor's claims, with the issues arising under bankruptcy law reserved for resolution here.[38]

The District Court specifically did not rule on questions of bankruptcy law affecting all creditors. Cynergy now attempts to broaden a limited ruling into sweeping claims that it takes all funds for all time.  The bankruptcy court is not merely a conduit for Cynergy's collection efforts against Debtor.  Instead, the Court must ensure that the

---

[37] Stipulation Between Debtor and Cynergy Holdings, LLC for Relief from the Automatic Stay for the Purpose of Liquidating Claims in Pending Litigation (the "RFS Stipulation"), bankr. ECF No. 62, (the parties "may proceed . . . under applicable non-bankruptcy law in order to liquidate their claims and proceed to final judgment in the District Court, provided that the stay remains in effect with respect to enforcement of any judgment against the Debtor or estate property").  See also In re Comstock, 111 B.R. at 855 (in certain limited circumstances it makes sense to liquidate bankruptcy claims in non-bankruptcy courts to avoid duplicative litigation, to prevent waste of scant federal judicial resources, or to allow a court of special expertise to resolve a dispute within its purview).

[38] See Dodd v. Hood River County, 59 F.3d 852, 862 (9th Cir. 1995) (quoting the Restatement (Second) of Judgments, "[c]onsent or tacit agreement is clear justification for splitting a claim.").

1
2
interests of all creditors of the estate are considered, in accordance with the Bankruptcy Code.[39]

3
4
5
6
7
8
9
10
11
12
13
14
The standard analysis for claim preclusion is not easily applied in bankruptcy proceedings.  In Brown Media Corp. v. K&L Gates, LLP, the plaintiffs, unsuccessful bidders in a bankruptcy proceeding, alleged that the defendants used their prior representation of the plaintiffs to undermine the plaintiffs' attempt to acquire assets in a bankruptcy sale.[40]  The district court granted the defendants' motion to dismiss on the grounds of claim preclusion, explaining that the plaintiffs could have raised their claims during the course of the bankruptcy proceedings and that allowing the plaintiffs' action to go forward would call into question the integrity of the bankruptcy court's final orders.[41]  In reversing the district court's ruling, the Second Circuit explored the difficulties in applying claim preclusion in bankruptcy contexts.

15
16
17
18
> Because a bankruptcy case is fundamentally different from the typical civil action, comparison of a bankruptcy proceeding with another proceeding is not susceptible to the standards of *res judicata* analysis.  Rather the Court must scrutinize the totality of the circumstances in each action and then determine whether there is identity of causes of action.

19
20
Brown Media Corp. v. K&L Gates, LLP, 854 F.3d at 158.

21
22
23
24
The New York Litigation was simply to liquidate a claim.  With that limited purpose clarified in the Relief from Stay Stipulation, the Court permitted the parties to continue the litigation outside of this Court.  Now that the District Court litigation has

25
26
27
28
[39] See Howard Delivery Service, Inc. v. Zurich American Ins. Co., 547 U.S. 651, 655 (2006) ("Bankruptcy Code aims, in the main, to secure equal distribution among creditors.  [internal citations omitted]  We take into account, as well, the complementary principle that preferential treatment of a class of creditors is in order only when clearly authorized by Congress).  See also  Pepper v. Litton, 308 U.S. 295, 304 (1939) (the bankruptcy court has equitable power to allow or disallow claims.)
[40] Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 155 (2nd Cir. 2017).
[41] Id. at 156.

rendered a liquidated judgment, Cynergy's liquidated claim is taken into consideration with all aspects of the administration of the estate.

## THE RESIDUALS

Multiple causes of action in the FAC turn on how to characterize the Residuals and what issues are precluded in this court because of the District Court's rulings.  A key issue in this case is whether Debtor is entitled to Second Period Residuals.  The first cause of action in the Amended Complaint seeks disallowance of Cynergy's $8.5 million claim, filed on August 14, 2015.  Causes of action two (offset and recoupment), three (accounting), and seven (turnover of Residuals as property of the estate) also turn on issues related to the Residuals.  Debtor seeks to "offset and/or recoup" against Cynergy's proof of claim the amount of Residuals earned during the Second Residuals Period.  To that end, Debtor also seeks an accounting of the Residuals collected by Cynergy during the Second Residuals Period.  Lastly, Debtor requests that any amount remaining after offset be turned over to Debtor, as debtor-in-possession, as property of the estate.

As stated earlier, the term "Residuals" is used to describe the compensation earned by Debtor under the ISO Agreement.  Compensation is defined as "all Merchant revenues collected by [Cynergy] from merchants in excess of the fees [provided for in the ISO Agreement]."[42]  After distributions made by Cynergy for fees, the portion set aside as the ISO Reserve under § 3.11(C), and the portion paid to Pacific Card Service, LLC, the remainder is to be paid into the Residual account as compensation for

---

[42] Motion to Dismiss FAC, Ex. 1.

Debtor.[43]  The District Court held that Cynergy has no right under the ISO Agreement to

hold the Residuals earned during the Second Residuals Period.[44]  The Circuit Court

ruling directed the District Court to offset the amount of Residuals improperly held by

Cynergy against its damage award.[45]  Thereafter, the District Court offset the amount of

Residuals held for the time period ending December 2012.[46]

Following the District Court's last ruling, Cynergy filed an amended claim

reducing its claim to $622,216, making this section of the first cause of action moot.

The FAC also requests disallowance of the remaining $622,216 claim due to an offset

of the Second Period Residuals. Debtor's position is that Cynergy's claim against the

estate should be offset by the Second Period Residuals.  Cynergy makes an argument

that it is entitled to the Second Period Residuals.

The District Court ruled that Cynergy did not have the right to hold the Residuals

under a plain reading of the ISO Agreement.  After the District Court's ruling that

Debtor's breach did not justify Cynergy refusing to pay any further Residuals, Cynergy

ignored that ruling in the way it put together its expert's damages calculation at trial,

specifically by claiming damages in the amount of the improperly held First Period

Residuals.  Cynergy then argued on appeal that even if it could not withhold the

Residuals because of Debtor's contract breach, there was a second material breach

when Debtor solicited its merchants after the ISO Agreement was terminated,

warranting a withholding of Residuals.[47]  The Second Circuit also rejected that

argument.  The Court of Appeals, in affirming the District Court's ruling that Cynergy did

---

[43] Id. at § 5.1.
[44] Id., Ex. 9, p. 21 ("Because Cynergy did not properly terminate the contract due to a material breach, it was not entitled to withhold residuals."); Ex. 12, p. 39-42.
[45] Id. at Ex. 12.
[46] Id. at Ex. 14.
[47] Process America v. Cynergy Holdings, LLC, 839 F.3d 125, 144 (2nd Cir. 2016).

not have the right to hold the Residuals, explained that Cynergy's damage award of

$8,521,182 must be further reduced by the amount of Residuals it withheld improperly

during the First Residuals Period.[48]  Cynergy's initial damage award was reduced to

$622,216 because it saved $3,939,966 by not making the Residual payments due to

Debtor under the ISO Agreement.[49]

Resting its argument on the Rule 59 Order, Cynergy maintains that Debtor's

claim to the residuals collected during the Second Residuals Period is barred by the

District Court's ruling that, by failing to seek to reopen the record and present evidence

in support of further offsetting the Cynergy damage award by the residuals accrued and

held during the Second Residual Period, Debtor waived its right to attempt to adjust the

damage award here.

Debtor correctly points to Cynergy's own actions to support its argument that

these issues were reserved for determination by the bankruptcy court.  By filing and

amending a proof of claim and moving forward with the Recoupment Motion, Cynergy

impliedly consented to resolving these issues in bankruptcy court.  Debtor had no

reason to continue to fighting these issues before the District Court; it raised the offset

issue before the District Court in the context of arguing that no damages may be owing

to Cynergy at all and thus prejudgment interest could not have accrued.

Cynergy is correct that the District Court has already liquidated its claim and

determined it to be $622,216.  It is now for this court to rule on the allowability of the

claim under bankruptcy law, and what assets are properly brought into the estate.

Cynergy's attempt to claim all Second Period Residuals here is identical to the

---

[48] Id. at 133-134.
[49] Turnover Motion, the Rule 59 Order, Ex. H, p. 6.

argument that has been rejected numerous times in the previous litigation.  The District

Court adjudicated solely the liquidation of the claim, but did not answer the entire

question of what is to happen to residuals after January 1, 2013, nor did it resolve

whether interest may be allowed on the bankruptcy claim.

    Property of the Estate under 11 U.S.C. § 541

    Under § 541, property of the estate includes, among other things, "all legal and

equitable interests of the debtor in property as of the commencement of the case."  See

11 U.S.C. § 541 (property of estate) and § 554(d) (property not abandoned or

administered remains property of estate); Pace v. Battley (In re Pace), 146 B.R. 562,

564–66 (B.A.P. 9th Cir. 1992), aff'd, 17 F.3d 395 (9th Cir.1994).

    The Second Period Residuals accrued to present are assets of the estate.  Both

the District Court and Second Circuit said the Second Period Residuals belong to

Debtor because Cynergy did not terminate the ISO Agreement in such a way to permit it

to retain the Residuals.  Debtor also alleges that Cynergy may not keep the EP/ ISO

Reserves because it breached the agreement by keeping the Residuals.  Cynergy

maintains that the District Court ruled on the Residuals by denying Debtor's request for

set off for the Second Period Residuals. But that is not exactly what the District Court

ruled. The District Court was never presented with the question of the ownership of the

Second Period Residuals in the New York Litigation.  Instead, the District Court ruled

simply that it was not recalculating the damages based on Debtor's procedurally

improper attempt to augment the record in a Rule 59 context.  Stated differently, the

District Court ruled that the Second Period Residuals do not reduce the damages

award, but the ruling said nothing about what happens to second residual period

amount.  Earlier rulings of the District Court and the Second Circuit that the Residuals belong to Process America were never altered.  All of the Second Period Residuals are post-petition and are ongoing income ***belonging to the bankruptcy estate***. Only the complexity of the New York litigation and a stay of proceedings here kept the estate from recovering such funds for the benefit of all creditors.[50]

The District Court could not have ruled on the rights to the Second Period Residuals.  At the time the issue was presented to the District Court, the question of what Cynergy was allowed to take as recoupment had already been litigated.[51] Reopening the record in the District Court to calculate residuals after January 2013 would have been beyond the scope of the approved RFS Stipulation and Order and interfering in issues that were being litigated in the bankruptcy court.  Relief from stay was permitted solely to liquidate Cynergy's claim.  That claim was for a period *before* the bankruptcy petition was filed. Offsetting the post-petition residuals to reduce Cynergy's claim would, in effect, give estate assets to a pre-petition creditor in violation of the priority scheme established by the Bankruptcy Code.[52]  Any post-petition assets of the estate properly come into the estate at this point, along with all claims, and their distribution must be made pursuant to the Bankruptcy Code.  Anything else would have violated the terms of the relief from stay order and Jevic.  Debtor is not barred from bringing a turnover action for the Residuals.  This claim was not decided or waived in the District Court.

---

[50] Cynergy has filed 41 evidentiary objections to the Declaration of Brad Smith ISO Debtor's Turnover Motion.  These objections are overruled as the statements are self-authenticating or within a hearsay exception.  Mr. Smith has provided relevant documents on which he relies, where he had no personal knowledge.
[51] See Recoupment Motion, bankr. ECF doc. 363; Order Granting in Part, Continuing the Hearing on Cynergy's Motion to Confirm Recoupment Rights or for Relief from the Automatic Stay to Effect Setoff, bankr. ECF No. 376.
[52] See Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 979 (2017).

1

2

3    ## TURNOVER OF THE EP/ISO RESERVES UNDER *11 U.S.C. § 542(a)*

4

5         The EP/ISO Reserves are at issue in the avoidance of lien discussion under the

6    Fifth Cause of Action, and the Sixth Cause of Action concerning turnover. The

7    characterization of the EP/ISO Reserves and whether they consist of both the original

8    Merchant Reserves as well as the funds set aside by the Cure Stipulation also affects

9
     the question of whether recoupment is allowed, whether the claim is fully secured or not
10
     and whether post-petition interest accrues.
11
         Debtor has brought a separate turnover motion and seeks immediate turnover of
12
13   these Reserves.  To support a cause of action for turnover, the trustee (or here, the

14   debtor-in-possession) has the burden of proof, by a preponderance of the evidence, to
15
     establish that: (1) the property is in the possession, custody or control of a noncustodial
16
17   third party; (2) the property constitutes property of the estate; (3) the property is of the

18   type that the trustee could use, sell or lease pursuant to section 363 or that the debtor

19   could exempt under section 522, and (4) that the property is not of inconsequential
20
     value or benefit to the estate.  5-542 Collier on Bankruptcy P 542.02 (16th Ed., 2013).[53]
21

22   _____

     [53] Section 542 states, in pertinent part:
23

24            (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian,
          in possession, custody, or control, during the case, of property that the trustee may use, sell,
25        or lease under section 363 of this title [11 USCS § 363], or that the debtor may exempt under
          section 522 of this title [11 USCS § 522], shall deliver to the trustee, and account for, such
          property or the value of such property, unless such property is of inconsequential value or
26        benefit to the estate.

27            (b) Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is
          property of the estate and that is matured, payable on demand, or payable on order, shall pay
28        such debt to, or on the order of, the trustee, except to the extent that such debt may be offset
          under section 553 of this title against a claim against the debtor.

              (c) Except as provided in section 362(a)(7) of this title [11 USCS § 362(a)(7)], an entity that

1

2    Debtor's Turnover Motion is premised on its interpretation of § 3.11(C) of the ISO

3    Agreement.   Debtor maintains that there is nothing in the ISO Agreement that supports

4    Cynergy's continued retention of the entire $1,788,866.25 ($250,000 held under the ISO

5    Agreement and $1,538,866.25 under the Cure Stipulation) when the reduced Reserve

6    Amount is only $128,000. Debtor contends that the correct interpretation of Section

7    3.11(C)(iii) of the ISO Agreement is that upon termination of the ISO Agreement, the

8

9    entire Reserve Amount should be returned to Debtor, except for the Reduced Reserve.

10   Debtor believes that the Reduced Reserve must then be kept on deposit until the

11   termination of all Merchant Agreements, after which Cynergy has 270 days to return the

12   remaining balance of the Reduced Reserve, if any.   Debtor's theory is that the purpose

13   of the Reduced Reserve is to cover the Merchant Loss, as indicated in the

14   establishment clause of Section 3.11(C)(i), and as measured by "Merchants' dollar

15

16   volume of Transactions during the month previous to the month of termination" of the

17   Agreement, as set forth in Section 3.11(C)(iii). When the last Merchant Agreement is

18   terminated, there will be no Merchant Losses against which to protect, and, thus, within

19

20   270 days after termination of said Merchant Agreements, "the remaining balance, if any,

21   of [the Reduced Reserve]" can be returned to Process America.

22

23

24

25   _____

26   has neither actual notice nor actual knowledge of the commencement of the case concerning
     the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith
     and other than in the manner specified in subsection (d) of this section, to an entity other than
27   the trustee, with the same effect as to the entity making such transfer or payment as if the case
     under this title [11 USCS §§ 101 et seq.] concerning the debtor had not been commenced.
     . . .
28   11 U.S.C. § 542

1

2    Cynergy argues that Debtor is estopped from pursuing its claim for turnover of

3    the EP/ISO Reserves because the District Court already determined that, under

4    § 3.11(C)(iii) and paragraph 5 of the Cure Stipulation, Debtor is not entitled to any

5    portion of the Reserve Funds until 270 days after the termination of all Merchant

6    Agreements, which Cynergy represents has not yet occurred.  Cynergy maintains that

7    this very issue was previously ruled on, precluding Debtor from raising it here.

8

9    The District Court ruled as follows on the EP/ISO Reserves:

10    Process America alleged that, after termination of the ISO
      Agreement, Cynergy breached the Agreement by failing to return
11    the $250,000 EP/ISO Reserve, and breached the bankruptcy
      stipulation by failing to return the $1,538,866.25. Process America
12    argues that the ISO Agreement required Cynergy to return the
      EP/ISO Reserve funds—both the $250,000 held pursuant to the
13    ISO Agreement and the $1,538,866.25 held pursuant to the
      bankruptcy stipulation—after termination. As to the bankruptcy
14    stipulation, Process America additionally argues that due to the
      termination, "as a practical matter," there is no 'future portfolio
15    growth' for which Process America's residuals should be held to
      provide security, and that Cynergy has therefore breached the
16    bankruptcy stipulation by failing to return the $1,538,866.25."
17
18    Process America has not raised an issue of fact as to whether
      Cynergy breached either the ISO Agreement or the bankruptcy
19    stipulation by failing to return the EP/ISO Reserves. Section
      3.11.C.iii directly addresses return of the EP/ISO funds, stating that
20    the balance will be returned 270 days after termination of "all
      Merchant Agreements." This provision refers to the termination of
21    all Merchant Agreements, and not to the termination of the ISO
      Agreement itself. *Cynergy argues, and Process America does not*
22    *dispute, that all of the Merchant Agreements have not been*
      *terminated.* Therefore, Cynergy's obligation to return the balance of
23    the $250,000 EP/ISO Reserve has not yet been triggered. To the
      extent Process America bases its entitlement to the $1,538,866.25
24    EP/ISO Reserve on the ISO Agreement itself, that argument fails
      for the reasons just stated. Further, Process America provides no
25    support for its contention that it should not be responsible for

26

27

28

merchants it no longer owns "as a practical matter" other than to state, in conclusory fashion, that this is so.

RJN re Turnover Motion, Ex. D, p. 11 (emphasis added).

Debtor's theory of immediate turnover under § 3.11(C)(iii) of the ISO Agreement is precluded by the District Court's ruling. That said, however, Debtor's theory that there may no longer be ongoing Merchant Agreements because it stopped boarding merchants with Cynergy after its termination of the ISO Agreement in 2011 is not precluded. The District Court notes that Debtor did not dispute that there were continuing Merchant Agreements when this ruling was made in April 2014.[54] While the District Court did rule that the conditions precedent for Cynergy's duty under the contract to release the EP/ISO Reserve funds to Debtor have not been met, nothing precludes this Court from deciding the issue of whether there are Merchant Agreements that are ongoing over four years after that ruling. Such determination is necessary to resolve the issue of whether the conditions precedent have been met for Cynergy to finally return the EP/ISO Reserve to Debtor. Cynergy cannot, and does not, argue otherwise. Thus, the District Court ruling does not preclude a determination of this issue here.

Although the District Court ruled that the conditions precedent to trigger Cynergy's duty to return the EP/ISO Reserve have not yet occurred, this does not mean that the funds in the EP/ISO Reserve are not property of the estate under § 541. Section 541 defines property as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The District Court has essentially determined that Cynergy has an obligation under the ISO Agreement to

---

[54] See id.

return the EP/ISO Reserve to Debtor, and only the timing and amount are at issue.

Thus, Debtor has, at the very least, an equitable interest in the funds held in the EP/ISO

Reserve.

Cynergy argues that the turnover of reserves cause of action must be dismissed

because the cause of action is not matured.  This argument begs the question sought to

be answered by the FAC – an answer must be filed and discovery commenced to

determine whether or not this is true.  Whether or not there are merchant agreements

ongoing, and the amount and ownership of what remains in the Reserve Funds must be

resolved in order to finally properly administer this bankruptcy estate after six years.

Cynergy next argues that a turnover action cannot involve the return of disputed

funds, citing In re Gurga.[55]  In Gurga, a chapter 11 debtor filed an adversary proceeding

against a creditor for breach of contract, breach of fiduciary duty, conversion,

accounting, and turnover. The creditor moved to stay the proceeding pending arbitration

and for relief from the automatic stay to proceed with the arbitration.[56] The bankruptcy

court denied the motion. The BAP reversed.[57] The BAP found that, except for the

turnover claim, the claims asserted were noncore proceedings.[58]  Although Cynergy

cites to the quote in Gurga that "[t]urnover involves the return of undisputed funds," it is

a case that otherwise focuses on whether arbitration clauses must be enforced in non-

core proceedings.  Cynergy's reliance on this dicta paints the issue with too broad a

brush.

---

[55] In re Gurga, 176 B.R. 196, 199-200 (B.A.P. 9th Cir. 1994).
[56] Id. at 199.
[57] Id. at 198.
[58] Id. at 199.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

There is a split in authority among the Circuits about this issue, which was explored by a bankruptcy court in Oklahoma.[59]  In a litany of authority on both sides of the issue, only one case was from a court in the Ninth Circuit, in which a bankruptcy court in the Southern District of California held that pursuing a disputed prepetition state-law contract claim by invoking the equitable remedy of Section 542 was outside the jurisdiction of the bankruptcy court.[60]  The reasoning in In re World Fin. Serv. Center, Inc. was focused entirely on the limited scope of its jurisdiction and the propriety of abstention.  The Court agrees with the plain language analysis of the Commercial Financial court that § 542(b) makes no requirement that the debt be undisputed.[61]

Cynergy's authority does not support a finding that a turnover can never involve the return of disputed funds.  A turnover of disputed funds may be ordered where, as here, a creditor has filed a proof of claim and subjected itself to the jurisdiction of the bankruptcy court to adjust its rights.  Cynergy filed a proof of claim, and later amended it to reflect the effect of the Remand Judgment. Debtor is not attempting to enforce an arbitration agreement, and there is no argument about this Court's authority to hear and determine the turnover action.  To the extent that Cynergy's authority stands for the proposition that a breach of contract claim cannot masquerade as a turnover action, this court is not trying a breach of contract claim.  All issues as to the breach of contract claims the parties had against each other under the ISO Agreement have been litigated elsewhere, to a final resolution.  At this stage, the Court is empowered to determine the extent of claims by and against the estate under its equitable power to adjust the

---

[59] In re Commercial Fin. Serv., Inc., 251 B.R. 414, 442 (Bankr. N.D. Okla 2000), reconsideration granted on other grounds, 255 B.R. 68 (Bankr. N.D.Okla. 2000).
[60] Taxel v. Commercebank (In re World Financial Services Center, Inc.), 64 B.R. 980, 986 (Bankr.S.D.Cal.1986).
[61] In re Commercial Financial Services, Inc., 251 B.R. at 423 (citing Kenston Management Co. v. Lisa Realty Co. (In re Kenston Management Co.), 137 B.R. 100, 107-08 (Bankr.E.D.N.Y.1992) ("The mere fact that the defendants deny these allegations of a matured debt does not take the trustee's action outside the scope of section 542(b).").

debtor-creditor relationship of those who choose to participate in the bankruptcy estate.[62] See In re Commercial Financial Services, Inc., 251 B.R. at 425.[63]

The District Court's ruling was just *at that point and not for all time.* The court stated:

> Section 3.11.C.iii directly addresses return of the EP/ISO funds, stating that the balance will be returned 270 days after termination of 'all Merchant Agreements.' This provision refers to the termination of all Merchant Agreements, and not to the termination of the ISO Agreement itself. Cynergy argues, and Process America does not dispute, that all of the Merchant Agreements have not been terminated. Therefore, Cynergy's obligation to return the balance of the $250,000 EP/ISO Reserve has not *yet* been triggered.

RJN re Turnover Motion, Ex. D, p. 11 (emphasis added).

If the obligation to return the funds has "not yet been triggered" then it follows that, at some point in the future, Cynergy's duty to return the funds *will* be triggered. The District Court's ruling could not be binding on future developments that *would* trigger the duty to return the balance of the Reserves. Once insufficient merchants are being processed to warrant such a large sum, Process America may be correct that turnover is warranted. Thus, a plausible cause of action clearly exists.

In a bankruptcy case, this amount must be resolved, monetized and finality imposed; other creditors cannot wait the years it may take for every merchant to terminate their relationship. The only justification Cynergy has for its position is its recoupment and set off theories, which are addressed later. From this point forward, any retention of funds over and above the percentage allowed under the formula in Section 3.11(C)(iii) of the EP/ISO Agreement for remaining merchants boarded with

---

[62] See In re Commercial Financial Services, Inc., 251 B.R. at 425.

[63] While the $300,318 contractual damages cap controlled the damages Process America could get from Cynergy for breach of contract, it does not control what must be turned over as an asset of the estate. Those are two separate inquiries.

Cynergy is a retention of estate assets that need to be distributed among all creditors.

Cynergy admitted at argument that at some point all merchants boarded by Debtor are

done.[64]

This immediate turnover motion is denied without prejudice because it is

premature.  While turnover of the reserves is not appropriate until certain factual issues

have been determined, it may be that, once an answer has been filed, a motion for

turnover of residuals may be appropriate.  To delay consideration of that issue further

prejudices the estate, so the Court would like to see this issue resolved soon.  The sixth

claim for relief for turnover of the reserves is sufficiently pled to overcome a motion

under 12(b).

## SECURED CLAIM ISSUES

The fifth cause of action seeks to avoid Cynergy's asserted lien and the secured

status of its claim. Debtor alleges that no portion of Cynergy's judgment is secured, but

at most, no more than $128,000 can be considered secured. The question of whether

any part of Cynergy's judgment is secured also runs through a number of the causes of

action in the FAC.

Cynergy argues that its entire claim is secured and perfected based on the ISO

Agreement and that it has setoff rights to the EP/ISO Reserve. Debtor argues that

Cynergy's asserted "lien" in the EP/ISO Reserve funds is now capped at $128,000, and

thus the claim could only be secured to that extent. If Cynergy's theory is correct, its

judgment is secured up to the value remaining in the EP/ISO Reserve (approximately

---

[64] The July 11 Transcript, 21:1-19.

$727,000).  Cynergy's asserted lien is based on the following language in the ISO

Agreement:

> Cynergy Data will have a lien and security interest in the Reserve
> Account and in all funds contained in the Reserve Account to
> secure all obligations of ISO under this Agreement. […]  Pursuant
> to Article 9 of the Uniform Commercial Code, as amended from
> time to time, Cynergy may direct the disposition of the funds within
> the Reserve Account and the financial institution bolding such
> Reserve Account shall comply with such direction without the
> further consent of the ISO.  Cynergy Data may charge any amounts
> due to Cynergy Data against the Reserve Account at any time.  ISO
> will not attempt to withdraw funds from or terminate or grant a
> security interest in the Reserve Account without Cynergy Data's
> prior consent. ISO will not grant to any third person a security
> interest in the Reserve Account, nor will it pledge, assign or permit
> any lien to attach to the Reserve Account.

ISO Agreement, § 3.11(C)(iv), Ex. A, p. 6-7.

Debtor argues that this security interest is limited to just the initial reserve account and

that the Cure stipulation did not alter the contractual cap in the ISO agreement, citing

§§ 3.11(C) and 3.11(D) of the ISO Agreement.

The District Court lumped these two amounts together for purposes of deciding

whether Cynergy breached the contract by not returning the reserve funds to Debtor,

stating, "Cynergy's obligation to return the balance of the $250,000 EP/ISO Reserve has

not yet been triggered. To the extent Process America bases its entitlement to the

$1,538,866.25 EP/ISO Reserve on the ISO Agreement itself, that argument fails for the

reasons just stated."

The District Court did not specifically rule on whether the combined reserves

were security for the Cynergy judgment, and its ruling on the breach of contract issues

did not address this question directly.[65]  When it awarded Cynergy pre- and post-

judgment interest, the District Court relied on non-bankruptcy law, specifically New York

law and 28 U.S.C. § 1961, neither of which raise issues of security interests or

perfection for the determination of whether interest is appropriately awarded.  The

District Court also did not necessarily rule on the security interest question in its one

sentence reference to the Reserve quoted above.[66]

Cynergy raises various arguments as to why it is secured and the fifth cause of

action must be dismissed.  As stated above, Cynergy argues that its claim is secured by

the language of the ISO Agreement; that its claim is secured by virtue of its alleged right

to setoff; and that its claim is secured under the UCC by its having perfected its lien by

control. The factual questions raised by these arguments cannot be resolved now --

specifically, whether under the UCC, as adopted by New York, the Reserve Account is

a "deposit account" as defined by UCC 9-102(a)(29), or "money" as defined by UCC 1-

201(b)(24), as incorporated by 9-102(c); whether Cynergy "controls" the Reserve

Account (if it is a "deposit account"), as defined by UCC 9-104(a); and whether Cynergy

has "possession" of the Reserve Account (if it is "money"), as defined by 9-312.  These

are inappropriately raised in a 12(b) motion because none of these facts are developed

at this stage.  Debtor's Fifth Cause of Action states a plausible claim for relief.

---

[65] See Rule 59 Order, p. 5-6.
[66] See Brown Media Corp. v. K&L Gates, LLP, 854 F.3d at 161 (holding that the circumstances did not demand that plaintiffs raise their claims in the bankruptcy proceeding, and noting that the relevant issues were not litigated).

## INTEREST ON CLAIM

In its Fourth Cause of Action, Debtor seeks to disallow all pre-judgment interest that accrued after it filed bankruptcy on November 12, 2012. It also seeks to disallow any post-judgment interest on the claim.

The District Court's April 19, 2017 order ruled that pre-judgment interest applies as a matter of New York law from the date of breach, February 3, 2011 to the date of judgment, February 21, 2017 (the "earliest ascertainable date the cause of action existed").[67]  The District Court also ruled that the start date for any post-judgment interest is February 21, 2017 and that Cynergy has a right to post-judgment interest as a matter of federal law, but that whether that was allowed in bankruptcy would be left to this court.   The District Court explained:

> Again, because the Bankruptcy Court lifted the stay for the purpose of liquidating the claims, the only issue before this Court is whether Cynergy is entitled to pre- and post-judgment interest under non-bankruptcy law. And, as Cynergy correctly points out, whether Cynergy will ultimately be permitted to recover pre-judgment interest under the Bankruptcy Code does not affect whether Cynergy has the right to such interest under non-bankruptcy law.

> Under New York law, Cynergy is entitled to pre-judgment interest starting on February 3, 2011 to the date of the judgment, and such interest is therefore awarded. The Court, however, passes no judgment as to whether Cynergy is entitled to recover this interest under the Bankruptcy Code.

Rule 59 Order, MTD FAC, Ex. 14, p. 324-325.

This leaves three questions for this court to determine:

1. Whether pre-judgment interest applies from February 3, 2011 until petition date, November 12, 2012;

---

[67] RJN in support of Turnover Motion, Ex. I, p. 5-6.

2. Whether pre-judgment interest applies from November 12, 2012 (petition date) through February 21, 2017 (Judgment date); and

3. Whether post-judgment interest from February 21, 2017 is permitted?

The District Court has resolved the first question – prejudgment interest applies from February 3, 2011, until the petition date of November 12, 2012. The second and third questions must await full discovery of what amounts are and were in the Residuals and Reserve Accounts.

The Code prohibits claims for post-petition interest on prepetition unsecured claims. 11 U.S.C. §§ 502(b)(2), 506(b). If the claim is un/undersecured, and/or the estate is insolvent, the end date for any interest is the petition date. See In re Standard Furniture, 3 B.R. 527 (Bankr. S.D. Cal. 1980) (interest on claims not allowable against an insolvent estate).

What date prejudgment interest would end depends on numerous unresolved factual issues. Given the lack of information about (1) the amount of the Residuals that are being held during the Second Residual Period, and (2) any post-petition reductions of the EP/ISO Reserve from the original $1.7 million amount asserted by Cynergy to approximately $727,000, it is unclear whether Cynergy's claim is unsecured. Because of the lack of information about the amount of Debtor's funds that Cynergy is holding that may be subject to turnover, it is also unclear whether Debtor's estate is insolvent. The issues raised by Cynergy's Motion to Dismiss are more appropriately raised in a motion for summary judgment after full discovery of the relevant facts. They require analysis of fact and law that are inappropriate at this stage. Debtor's FAC sufficiently states a claim for relief, so the fourth cause of action will not be dismissed.

## RECOUPMENT/ SETOFF

There are competing requests for recoupment or setoff at issue in these motions. Debtor alleges a right to recoupment or setoff of the residuals in its second cause of action. It seeks to have the post-petition residuals offset against Cynergy's judgment. Cynergy seeks to recoup the "Net Judgment Amount"[68] against the Reserve Fund and Cure Stipulation, or, in the alternative, relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (d)(2) to set off the Net Judgment Amount against the Reserve Fund and Cure Stipulation under 11 U.S.C. § 553.

Equitable recoupment is a common law doctrine that is not expressly recognized in the Bankruptcy Code, but is preserved through judicial decisions.[69]  Recoupment "is the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim."[70]  It involves "netting out debt,"[71] and is allowed "because it would be inequitable not to allow the defendant to recoup those payments against the debtor's subsequent claim."[72] Because the defense is based in equity, "courts should apply the recoupment doctrine in bankruptcy cases only when it would be inequitable for the debtor to enjoy the benefits of [a] transaction without meeting its obligations."[73]

---

[68] Cynergy defined "Net Judgment Amount" in the Recoupment Motion as $8,521,182, the amount of damages originally awarded to it by the District Court, after deducting Debtor's liquidated damages of $300,818.  Supp. Brief re Recoupment Motion, 7:20-21, bankr. ECF No. 363.  This amount was reduced to $961,281 by the District Court in the Remand Judgment (including disputed interest), and is reflected in Cynergy's Amended Proof of Claim no. 39-3, June 14, 2017.

[69] In re Madigan, 270 B.R. 749 (B.A.P. 9th Cir. 2001) (quoting 5 Collier on Bankruptcy ¶ 553.10 (15th ed. rev.2001)).

[70] Newbery Corp. v. Fireman's Fund Ins. Co., 95 F.3d 1392, 1399 (9th Cir.1996) (quoting 4 Collier on Bankruptcy, ¶ 553.03, at 553–15 (15th ed.1995)) (emphasis in original).

[71] Oregon v. Harmon (In re Harmon), 188 B.R. 421, 425 (B.A.P. 9th Cir. 1995).

[72] Newbery, 95 F.3d at 1401; Long Term Disability Plan of Hoffman–La Roche, Inc. v. Hiler (In re Hiler), 99 B.R. 238, 243 (Bankr.D.N.J.1989) ("[T]he application of recoupment goes to the equity of the claim.").

[73] Newbery Corp., 95 F.3d at 1403 (internal citations and quotations omitted).

In recoupment, the respective claims may arise either before or after the commencement of the bankruptcy case, but they must arise out of the same transaction. <u>Newbery</u>, 95 F.3d at 1399. The creditor is allowed "to assert that certain mutual claims extinguish one another ... in spite of the fact that they could not be 'setoff' under 11 U.S.C. § 553."[74]  As recoupment is neither a claim nor a debt, it is unaffected by either the automatic stay or the debtor's discharge.[75]

To establish a right of setoff, the creditor must demonstrate that: (1) the debtor owes a debt to the creditor that arose pre-petition; (2) the debtor has a claim against the creditor that arose prepetition; and (3) the debt and claim are mutual.[76]  Section 553 "is not an independent source of law governing setoff; it is generally understood as a legislative attempt to preserve the common-law right of setoff arising out of non-bankruptcy law."[77]  Under section 553(a), each debt or claim sought to be offset must have arisen prior to filing of the bankruptcy petition. In addition, "a claim may ... be set off without regard to whether it is contingent or unliquidated, as long as the claim qualifies as 'mutual' under applicable nonbankruptcy law...."[78]  For the debts to be considered "mutual," they must be "in the same right and between the same parties, standing in the same capacity."[79]

The mutuality requirement stems from section 553(a)'s reference to "a mutual debt" owed by a creditor to the debtor against the creditor's claim against the debtor, and it is strictly construed. The right of setoff is permissive, not mandatory; its

---

[74] <u>Lee v. Schweiker</u>, 739 F.2d 870, 875 (3rd Cir.1984).

[75] <u>Harmon</u>, 188 B.R. at 425; <u>TLC Hosps.</u>, 224 F.3d at 1011; <u>Newbery</u>, 95 F.3d at 1399–1400; <u>Mercy Hosp. of Watertown v. New York State Dept. of Social Servs.</u>, 171 B.R. 490, 494–95 (N.D.N.Y.1994).

[76] <u>In re Luz Int'l, Ltd.</u>, 219 B.R. 837, 843 (B.A.P. 9th Cir. 1998).

[77] <u>United States v. Arkison (In re Cascade Roads, Inc.)</u>, 34 F.3d 756, 763 (9th Cir.1994) (quoting <u>United States v. Norton</u>, 717 F.2d 767, 772 (3d Cir.1983)).

[78] <u>Newbery</u>, 95 F.3d at 1398 (internal citation omitted).

[79] <u>Id.</u>

application "rests in the discretion of [the] court, which exercises such discretion under the general principles of [equity]."[80]  "The burden of proving an enforceable right of setoff rests with the party asserting the right."[81]  Finally, the right of setoff is subject to the automatic stay provisions of Chapter 11.[82]

In contrast to setoff, recoupment "is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim.[83]  Under recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.'".[84]

Recoupment, like setoff, has been applied in bankruptcy proceedings.[85]  The distinctions between recoupment and setoff are particularly important in bankruptcy. In Newbery, the Ninth Circuit explained that the primary difference is that the limits placed on setoff under § 553 generally do not apply to recoupment claims. For example, "[t]he chief importance of the recoupment doctrine in bankruptcy is that, unlike setoff, recoupment is often thought not to be subject to the automatic stay."[86] In addition, "[i]nvocation of recoupment also relaxes the requirement of mutuality for setoff of debts as it relates to the pre or postpetition character of those debts."[87]

Cynergy's Recoupment Motion

Cynergy argues that it may recoup the "Net Judgment" from the Reserve Funds and the Cure Stipulation.  It argues that this Court's earlier finding of a "related

---

[80] In re Cascade Roads, 34 F.3d at 763 (internal quotation marks and citation omitted).
[81] Newbery, 95 F.3d at 1399.
[82] See 11 U.S.C. § 362(a)(7) (staying "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor").
[83] Newbery, 95 F.3d at 1399.
[84] Id.
[85] Id.
[86] Id. at 1400.
[87] Id.

transaction" and the District Court's determination of the amount of the claim have already made the necessary findings entitling it to recoupment.  The equation is not that simple.

Debtor does not dispute that the elements of offset and recoupment are met between the parties but opposes Cynergy's recoupment because Debtor has its own recoupment rights against Cynergy for what it believes are approximately $2.28 million of residuals that Cynergy has not recognized. Debtor argues that if Cynergy's recoupment or offset is granted, the net effect would be an egregious windfall to Cynergy because it would recover its entire claim and also keep $2.28 million in improperly withheld residuals, leaving nothing for other creditors.  Debtor maintains that the Court must consider its countervailing recoupment and offset rights before Cynergy may be allowed to recover any further funds.

Debtor also objects to any post-petition interest being included in the offset. Debtor argues that the plain language of § 506 does not provide for post-petition interest on a secured claim based on offset.  Debtor explains its position in a plain language analysis of §§ 506(a)(1) and 506(b).[88]  The thrust of Debtor's plain language analysis is that § 506(a)(1) defines differently the parameters of  claims secured by a lien on property in which the estate has an interest, compared to claims deemed secured by right of setoff.  Debtor points to the language explaining that a claim secured by a lien is secured "to the extent of the value of the creditor's interest in the estate's interest in such property," while a claim secured by way of setoff is secured only "to the extent of the amount subject to setoff."  So, under the plain language of § 506(a)(1), a claim secured by right of setoff is not secured up to the value of the EP/ISO Reserve

---

[88] See Debtor's Opp. to Renewed Recoupment Mtn., 19:10-22:9.

and/or the Residuals (as it would be for a secured claim based on a lien), but is instead only secured up to the extent of the amount subject to setoff against the EP/ISO Reserve and/or the Residuals.  From this plain language reading of § 506(a)(1), Debtor contends that § 506(b) does not apply to claims secured by right of setoff, as interest under § 506(b) is limited by its language to situations where "an allowed secured claim is secured by property the value of which […] is greater than the amount of such claim…."  While Debtor cites no case law to support its position, it notes that "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."[89]  Debtor's analysis is consistent with a fair statutory reading and raises sufficient issues to further delay any decision on recoupment on equitable grounds.  This is especially appropriate because "[s]etoff runs contrary to the fundamental bankruptcy policies such as the equal treatment of creditors and the preservation of a reorganizing debtor's assets."[90]

Cynergy points to the language of the ISO Agreement in § 3.11.C that Cynergy has the "right to offset from the Compensation and from the Reserve Account 100% of the amount of any Merchant Loss and any amount owed to Cynergy Data [now New Cynergy] under this Agreement." Cynergy also argues that the 2010 Cure Stipulation allowed it to hold further funds as part of the IP/ESO Reserve. It lumps these two amounts together and seems to argue that the language of the original ISO Agreement allows it to offset against the entire sum – the original merchant reserves and the Cure Stipulation amounts.

---

[89] U.S. v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240-41 (1989).
[90] See Newbery, 95 F.3d at 1400 (noting that recoupment results in a preference for a creditor not otherwise allowed under the Bankruptcy Code).

This Court ruled on September 9, 2015 that recoupment of $128,000 was permitted with respect to original merchant reserve.[91]  A decision on anything above the $128,000 was specifically put in abeyance until the Second Circuit had ruled on the appeal.  When this Court permitted the recoupment of $128,000, the Court found that there was a sufficiently logical relationship between the Judgment and the EP/ISO Reserve because they were based on the same transaction.   Although the $128,000 provided for in the ISO Agreement was found to be part of the same transaction, there was no ruling with respect to the Cure Stipulation.[92] Cynergy now asserts that the Cure Stipulation & the ISO Reserve are part of the "same transaction."[93]   In the original RFS/Recoupment Motion, however, Cynergy asserted solely that the Judgment and "the Reserve Fund arise out of the same contractual relationship – the ISO Agreement."[94]  With the exception of a brief mention in the "operative facts section" that "the Reserve Fund […] is deemed an EP/ISO Reserve Fund under the ISO Agreement and the Stipulation," the briefing was silent as to why the Cure Stipulation is part of the "same transaction" for the purposes of recoupment.[95]  So, while Cynergy is right that it has already been determined that the original reserve amount is part of the same transaction, the question was still open as to whether the Cure Stipulation can be considered part of the same transaction.

Cynergy reasons that the Judgment resulted from "the claims between it and Debtor as to the breach of the ISO Agreement and various other causes of action based on the parties' respective conduct under the ISO Agreement." Cynergy contends that

---

[91] See Hr'g Tr. re Recoupment Motion, Sept. 9, 2015, 29:3-8 (Bankr. ECF doc. 465).
[92] Id., at 5: 21-24 and 26:1- 7.
[93] Id at 22:19-23:5.
[94] Cynergy's Motion to Confirm Recoupment Rights or For Relief From Automatic Stay To Effect Setoff, 7:22-23 (bankr. ECF doc. 363, Aug. 19, 2015).
[95] See Hr'g Tr. re Recoupment Motion at 11:19-12-19.

the contractual relationship is sufficient to create a "logical relationship" between its

claim for the Judgment and Debtor's claim for return of the Reserves for the purposes of

recoupment because each claim arises from the same transaction, the ISO Agreement

and the same set of aggregate facts, the parties' performance under the ISO

Agreement.

The "logical relationship" test was outlined by the Supreme Court in <u>Moore v.
New York Cotton Exchange</u>.  In <u>Moore</u>, the Supreme Court stated that "'[t]ransaction' is

a word of flexible meaning. It may comprehend a series of many occurrences,

depending not so much upon the immediateness of their connection as upon their

logical relationship." [96]  The Net Judgment Amount and the Cure Stipulation do not as

obviously arise out of the same transaction such that they may be recouped against

each other at this time. The parties' competing claims resulting in the Cure Stipulation

have not yet been fully explored.  Whether they are sufficiently related must be left for

another day, once the other issues are decided here.

Cynergy also claims that the amount of recoupment was already determined by

the District Court.  At oral argument on the Recoupment Motion, however, when the

Court asked whether Cynergy had asked for recoupment rights in the District Court,

Cynergy's counsel did not believe it had and argued that "there really hasn't been an

issue of fact as to whether there's recoupment rights."[97] The District court did resolve

the amount of the competing claims and set off certain prepetition amounts due to or

from each party, but it did not decide the recoupment question, which is different.

---

[96] <u>Moore v. New York Cotton Exchange</u>, 270 U.S. 593, 610 (1926); <u>see also</u> <u>Albright v. Gates</u>, 362 F.2d 928, 929 (9th Cir.1966) ("In deciding what is a transaction, we take note that the term gets an increasingly liberal construction.").
[97] <u>Hr'g Tr. re Recoupment Motion</u>, Sept. 9, 2015, 21:17-22:6 (bankr. ECF doc. 465).

The District Court specifically discussed the different reserve amounts and ruled simply that it was premature to decide that question. This Court must look at what was actually litigated and necessarily decided in the District Court. Debtor argued that the Cure Stipulation arose out of a separate dispute and was not subject to the 3.11(C)(iii) language in the ISO Agreement. It is still unsettled whether the Cure Stipulation is the same transaction as the ISO Agreement for recoupment purposes here. The District Court ruled that the Cure Stipulation amount was controlled by the same language of the ISO Agreement as the Merchant Reserve, as far as the triggering event for release of the funds. The District Court necessarily decided that the terms of one control the other as a matter of contract interpretation but that court did not rule, either explicitly nor implicitly, that they were necessarily "the same transaction," for recoupment purposes. Thus, based on this Court's earlier ruling and the District Court's ruling, the issue has been settled that the Judgment and the EP/ISO Reserve arise out of related transactions (*i.e.*, the ISO Agreement), but whether the Cure Stipulation is included as part of that "transaction" is not decided. The base judgment amount of $662,216 would be part of the same transaction.

There are no undisputed facts affecting whether Cynergy may recoup the basic judgment amount of $662,216 from the EP/ISO Reserves. The judgment is final. This does not resolve the issue though, because Debtor has competing recoupment claims. There are also disputed facts affecting whether sufficient funds remain in the EP/ISO Reserve to permit recoupment of any interest on the judgment. Debtor has raised the issue of whether Cynergy has already improperly taken funds from the reserve accounts that were not authorized. The issue of whether Cynergy was permitted to recoup its

attorney's fees from either the EP/ISO Reserve or the Residuals for the New York

Litigation is discussed in the Accounting section below. The Recoupment Motion is

denied pending resolution of these issues.

<u>Debtor's Recoupment/Setoff Claims</u>

Debtor's second cause of action claims recoupment and setoff for the Second

Period Residuals. It seeks to have them setoff against Cynergy's damages claim.

Debtor argues that issues of recoupment and offset should be litigated here because

they are "not part of the New York lawsuit."[98]  Cynergy argues that one's right of

recoupment is not a "claim" to which one can object.[99]  None of Cynergy's cited

authorities, however, address the question of whether recoupment is affected by the

application of § 502.  Recoupment is controlled by § 502 in that it must first be

determined if there is a claim to be paid before the analysis can proceed to see if

recoupment applies.

Cynergy argues that Debtor did not have a claim for unpaid Residuals, so it

cannot claim any recoupment or turnover of those Residuals.  It threatens to reopen its

own additional claims for damages. This argument ignores the District Court and

Second Circuit rulings on which Cynergy so adamantly relies for its existing claim. All

claims between these two parties were resolved and are final.  The breach of contract

issues have all been decided and the result of the rulings of the District Court and the

Second Circuit is that the Second Period Residuals are assets of the estate.

While Debtor's second cause of action may not properly sound in recoupment

because of recoupment's role as a defense, it also claims a setoff and is to be read in

[98] <u>Id.</u> at 15:7-13.
[99] <u>See</u> <u>American Home Mortg. Holdings, Inc.</u>, 402 B.R. 87, 94 (Bankr. D. Del. 2009)(holding that recoupment is a
"defense" and not a "claim," such that a sale free and clear under § 363 does not extinguish a right of recoupment).

conjunction with the turnover cause of action. In addition, to the extent Cynergy

continues making any claim to the Second Period Residuals, recoupment may be a

proper defense. The FAC must be read as a response to Cynergy's proof of claim, and

there must be some place for Debtor to assert its recoupment claim.  If Cynergy's

position is correct that recoupment is a defense and not a claim, then their right of

recoupment is not properly raised in a 12(b) motion.  Cynergy is required to file an

answer, asserting its alleged right of recoupment as a defense.[100]

Although the doctrines of res judicata and collateral estoppel preclude a party

from litigating claims and issues that the party raised or could have raised in a prior

proceeding, the parties could not have litigated before the District Court how assets of

the estate should be liquidated.  The relief from stay order did not authorize the transfer

of assets of the estate, especially post-petition assets. Contrary to Cynergy's argument,

it is not too late to determine the amount of post-petition residuals due the estate.

This is a bankruptcy case with many other creditors.  This Court must focus on

ensuring the bankruptcy principles of marshaling the assets of the debtor for the benefit

of creditors of the estate.[101]  The sole purpose of the relief from stay was to determine

the amount of claims between Debtor and Cynergy; the parties were to return to this

Court for payment.  While the offset of the prepetition residuals against the damage

claim was understandable, given the standards governing setoffs, any post-petition

accounting and setoffs must be done in this court under principles governing bankruptcy

---

[100] See In re Clemens, 261 B.R. 602 (Bankr. M.D. Penn. 2001)(explaining that in any other federal forum besides
bankruptcy, the defendant bank would have been required to have pled the [recoupment] claim as a defense to a
lender liability suit by reason of Federal Rule of Civil Procedure 13).

[101] See Brown Media v. K&L Gates, 854 F.3d at 158, (explaining that "a bankruptcy court's foremost concern is
maximizing the value of the debtor's estate.").

cases.  Debtor's Second Cause of Action properly seeks to resolve all recoupment and

offset issues before any payment of a claim.  It will not be dismissed.

## ACCOUNTING

The third cause of action seeks an accounting of the residuals Cynergy collected

during the Second Residual Period as well as the merchant agreements that remain

and have been terminated. Cynergy argues that this issue is precluded by the District

Court's ruling rejecting Debtor's request for an accounting as part of its motion to offset

the Residuals against the damage award. As the District Court ruling did not preclude

further treatment of the Residuals in the bankruptcy estate, the accounting of those

residuals is also not precluded.

On June 14, 2017, when Cynergy amended its claim a second time, it asserted

that its claim was secured by $727,055.64 in the Reserve account.[102]    Debtor then

responded with serious concern over the decline from the approximately $1,700,000

asserted as the security for its reserves by Cynergy in its Original and First Amended

Proof of Claim, dated September 18, 2014 and August 14, 2015, respectively.  At the

July 11, 2017 hearing, the parties stipulated to maintain the remaining $727,055.64 in

the Reserves by moving the funds in to a separate debtor-in-possession account,

pending resolution of these issues.[103]    These questions alone warrant the full

accounting requested by Debtor.

This cause of action is necessary in order to resolve the remaining causes of

action. No one but Cynergy knows what is in any Residual account it controls and how

---

[102] Addendum to Cynergy's Second Amended Proof of Claim, ¶ 6.
[103] Tr. re Evid. Hr'g re Motion to Approve Settlement, Motion to Dismiss, Motion for Turnover, and Motion for Recoupment (the "July 11 Transcript", July 11, 2017, 145:9-147:7 (bankr. ECF No. 477).

the funds were used. It is critical to finally wrapping up the affairs of this estate after six

years to know how many of Debtor's merchants are still boarding with Cynergy.  Even if

Debtor is found to have only had a contingent interest in any of this due to the terms of

the ISO Agreement, the extent of the estate's interest should be clarified.

Debtor has raised certain issues with respect to the EP/ISO Reserves that

cannot be resolved on this record but which go to how much is or should be in the

Reserves.  For example, Cynergy appears to have taken its attorney fees out of the

EP/ISO Reserves.  Cynergy argues that it used the Reserve Funds for their intended

purpose – to cover losses and liabilities, including attorneys' fees attributable to the ISO

Agreement.[104]  The District Court, however, declined to award Cynergy attorney's fees

related to the New York litigation.  In clarifying the issue of indemnity and the parties'

respective liability for costs and attorney's fees under the ISO Agreement and the

general rule under New York law that indemnity agreements presumptively cover only

third-party claims, the District Court explained, "Therefore, the indemnification clause

cannot be read as a general fee-switching provision.  If the parties had intended that,

the provision could simply have stated that 'the prevailing party shall be entitled to

recover its reasonable attorney fees.  Cynergy has not directed me to any such

language."[105]

Even if District court had permitted some of the EP/ISO Reserves to be used in

this fashion, there has never been an accounting submitted to explain what is owed this

estate and what rightfully can be taken by Cynergy under the bankruptcy rules on

attorney fees.  Cynergy may have been setting off various amounts, including attorney

---

[104] The July 11 Transcript, 56:22-57:15 (bankr. ECF No. 477).
[105] Turnover Motion, Ex. F, internal p. 7.

fees which were later disallowed, during the course of the New York Litigation. Relief

from stay was required in order to effect any set off. Set off and recoupment were

specifically NOT allowed by this Court except for the $128,000. The large judgment

was on appeal – the status quo should have been maintained with respect to anything

that may have been characterized as an asset of the estate. If Cynergy decided on its

own, post-petition, to help itself to funds that are determined to belong to the estate, as

appeared to possibly be the case by Cynergy's counsel's representations at oral

argument,[106] a full accounting is necessary to determine what is owed the estate and to

what portion of the funds, if any, Cynergy had a proper claim. The Motion to Dismiss

the third cause of action is denied.

## EQUITABLE SUBORDINATION

Debtor's eighth cause of action is for equitable subordination, claiming that

Cynergy terminated the ISO Agreement when it was not necessary, did not give the

required notice of the termination, and then improperly withheld residual payments

owed to Process America. Debtor alleges that all other creditors have been harmed

because it has not had access to the millions of dollars in residuals that were improperly

withheld by Cynergy with which to pay the other creditors. Debtor alleges that so long

as Cynergy improperly withholds residuals earned during the Second Residual Period,

any and all of its claims against the estate should be equitably subordinated to all other

creditors of the estate.

The subordination of claims based on equitable considerations in a bankruptcy

proceeding generally requires three findings: "(1) that the claimant engaged in some

---

[106] The July 11 Transcript, 55:25-63:13 (bankr. ECF No. 477).

type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair

advantage on the claimant, and (3) that subordination would not be inconsistent with the

Bankruptcy Code."[107]    Where non-insider, non-fiduciary claims are involved, as is the

case here, the level of pleading and proof is elevated: gross and egregious conduct will

be required before a court will equitably subordinate a claim.[108]    Where, as here, the

claimant is not an insider, the objecting party "must prove that the claimant is guilty of

gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of

others.'"[109]

The FAC must allege a plausible theory meeting these criteria, and the issue

must not have been necessarily and actually litigated in the District Court.  The plausible

theory debtor must plead in the FAC is that Cynergy's conduct was gross and

egregious. Cynergy's conduct must be tantamount to fraud, overreaching or spoliation

to the detriment of other creditors.[110]    Process America argued at the District Court and

Second Circuit that Cynergy's failure to pay residuals was so significant that it

constituted a material breach of the contract, excusing Process America from its

obligations under the contract.

The District Court found that the facts before it did not support an inference that

Cynergy's breach of the contract was "gross negligence, recklessness, or willful

misconduct."[111]    The District Court specifically found that Cynergy's termination of the

---

[107] Feder v. Lazar (In re Lazar), 83 F.3d 306, 309 (9th Cir.1996) (citing Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 699–700 (5th Cir.1977)).
[108] See In re Pacific Express, Inc., 69 B.R. 112, 116 (B.A.P. 9th Cir.1986) ("The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity.").
[109] Id. (quoting Matter of Teltronics Services, Inc., 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983) (citations omitted)).
[110] In re Pacific Exp., Inc., 69 B.R. at 116.
[111] FAC, Ex. E, internal p. 4.

ISO Agreement did not constitute "egregious intentional misbehavior evincing extreme culpability" that would entitle Debtor to avoid the damages cap in the ISO Agreement.[112]

The Second Circuit agreed with the District Court that there was insufficient evidence to even raise a genuine issue of material fact as to Cynergy's basis for terminating the ISO Agreement, so that the willful misconduct exception to the damages cap did not apply.  The Second Circuit held that Cynergy's failure to pay residuals was "not so significant as to constitute a material breach."  The Second Circuit stated that the only evidence that Cynergy was withholding residuals for an improper purpose was speculation. The Second Circuit even seemed to justify the reasonableness of Cynergy's actions, despite finding that they were wrong to withhold the residuals, stating:

> Furthermore, Section 6.4 of the ISO Agreement explicitly states that Process America is not entitled to residuals if Cynergy terminates the ISO Agreement due to Process America's material breach.  Thus, the ISO Agreement explicitly contemplates the situation that occurred here—Cynergy's unilateral withholding of residual payments.  It is true that, as the district court found, Cynergy was not entitled to do so under the particular circumstances. Nonetheless, Cynergy's attempt to exercise an express contractual right does not constitute a material breach of the contract that would excuse non-performance of a separate obligation.

839 F. 3d 125 at 137.

Debtor alleges that Cynergy's improper withholding of residuals was the catalyst for its ultimate financial demise.  It argues that equitable subordination is exclusively a question of bankruptcy law, and the previous court's ruling was solely as a matter of New York contract law.  The question under the New York breach of contract question was whether New York law allows one party to willfully and blatantly breach a contract

---

[112] Id. at p. 6.

based on its own economic self-interest.[113]  Debtor argues that the District Court did not

and could not have considered whether the misconduct resulted in injury to competing

creditors because that court was simply adjudicating a two-party dispute.

The initial inquiry for equitable subordination is whether Cynergy engaged in

inequitable conduct that is egregious.  It may not simply be sharp dealing, but must be

misconduct tantamount to fraud or overreaching to the detriment of others.[114]  The

District Court and Second Circuit have ruled that the conduct was not egregious.

Although the District Court did not consider whether the alleged misconduct injured

creditors or conferred an unfair advantage on Cynergy, or whether subordination would

be inconsistent with the Code, this Court is precluded from reaching the second and

third elements of the cause of action where a specific finding was made that negates

any finding of significantly bad conduct. Although these findings were as a matter of

New York contract law, and not an analysis of equitable subordination under 11 U.S. C.

§ 510, the initial inquiry of whether Cynergy's conduct was inequitable has been

litigated.  Where the District Court found that the conduct was not "egregious intentional

behavior evincing extreme culpability'" it has found the facts against Debtor as to the

threshold element in an equitable subordination claim. Thus, Debtor is precluded from

relitigating the pre-petition conduct that has been litigated in the District Court.

As noted earlier, the District Court was adjudicating a pre-petition claim and not

addressing matters unique to the bankruptcy case.  There are certain post-petition

actions alleged by Debtor that may still be considered in this Court.  In April 2014, on

cross-motions for reconsideration of the District Court's prior summary judgment rulings,

---

[113] Banc of Am. Sec., LLC v. Solow Bldg Co., II, 47 A.D. 3d 239, 847 N.Y.S. 2d 49, 55 (2007); Appellate Decision, 839 F.3d 125, 138 (2d Cir. 2016).

[114] Pacific Express, 69 B.R. 112 at 116; Kilimnik v. Stoumbos, 988 F.2d 949, 960 (9th Cir. 1993).

the District Court ruled that Cynergy was not entitled to withhold residuals.[115]  Thus, it follows that if Cynergy had no right to keep the Residuals under the ISO Agreement, the Residuals belong to Debtor. Nevertheless, the expert report relied on by the District Court at the subsequent trial on damages assumed that Cynergy was entitled to retain Process America's residuals.  The Second Circuit then ruled in October 2016 that the District Court erroneously included Residuals that should have been paid to Debtor. The First Period Residuals have now been resolved by the District Court, but the Second Period Residuals remain unavailable to Debtor for use in its bankruptcy case. Whether Cynergy's "non-material" *continuing* breach continues to injure other creditors of the estate following the rulings in the New York Litigation from here forward is a separate question.  It is a question of fact and law that was never addressed in the District Court.  Thus, paragraphs 106, 106 and 110 – 117 of the Eighth Cause of Action are dismissed with prejudice because they are precluded.  The remaining paragraphs state a plausible cause of action for continuing harm post-petition and will be subject to proof.

## DECLARATORY RELIEF

The Ninth Cause of Action is for Declaratory Relief within which Debtor seeks a judicial determination as to the rights and interests of the parties in the EP/ISO Reserve and for a determination that the EP/ISO Reserve Account and additional deposits are property of Debtor's estate.  While these issues will likely be resolved through other causes of action, this cause of action will not be dismissed because it may be necessary to address remaining questions affecting the claim.

---

[115] <u>MTD</u>, Ex. 9.

1

## CONCLUSION

2

3        The Motion to Dismiss is DENIED as to all but paragraphs 106 and 110-117.

4   These paragraphs are dismissed with prejudice.  The Motions for Immediate Turnover

5   and for Recoupment are denied without prejudice at this time.

6        The deadline for filing a responsive pleading to the FAC is July 13, 2018.  The

7   Court to issue orders on the above motions concurrently with this Memorandum.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Date: June 8, 2018                              _____

25                                                        Maureen A. Tighe
                                                          United States Bankruptcy Judge
26

27

28